CHRISTOPHER D. SULLIVAN (148083)
csullivan@diamondmccarthy.com
STACEY L. PRATT (124892)
stacey.pratt@diamondmccarthy.com
KAREN K. DIEP (305587)
kdiep@diamondmccarthy.com
DIAMOND MCCARTHY LLP
150 California Street, Suite 2200
San Francisco, CA 94111
Phone: (415) 692-5200

*Counsel for the Permanent Receiver
for the Receivership Entities and Joint Official
Liquidators of DLIFF (in Official Liquidation)*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRADLEY D. SHARP, as the Permanent Receiver for the Estate of DIRECT LENDING INVESTMENTS, LLC, DIRECT LENDING INCOME FUND, L.P., DIRECT LENDING INCOME FEEDER FUND, LTD., DLI CAPITAL, INC., DLI LENDING AGENT, LLC AND DLI ASSETS BRAVO, LLC AND THEIR SUCCESSORS, SUBSIDIARIES, AND AFFILIATED ENTITIES, and BRADLEY D. SHARP and CHRISTOPHER D. JOHNSON, as Joint Official Liquidators of DIRECT LENDING INCOME FEEDER FUND, LTD. (in OFFICIAL LIQUIDATION), Plaintiffs, v. DUFF & PHELPS, LLC, a Delaware | Case No. 2:20-cv-08069 **COMPLAINT FOR DAMAGES** **1) Professional Negligence; 2) Gross Negligence; 3) Aiding and Abetting Breach of Fiduciary Duty; 4) Negligent Misrepresentation; and 5) Breach of Contract** **JURY TRIAL DEMANDED** |

1  limited liability company,

2            Defendant.

3

Plaintiffs Bradley D. Sharp, as the Permanent Receiver ("Permanent Receiver") for the Estate of Direct Lending Investments, LLC ("DLI"), Direct Lending Income Fund, L.P. ("DLIF"), Direct Lending Income Feeder Fund, Ltd., ("DLIFF"), DLI Capital, Inc., DLI Lending Agent, LLC and DLI Assets Bravo, LLC and their successors, subsidiaries, and affiliated entities (collectively "the Receivership Entities"), and Bradley D. Sharp and Christopher D. Johnson, as Joint Official Liquidators of DLIFF (in Official Liquidation), hereby allege and complain against Defendant Duff & Phelps, LLC ("Duff & Phelps" or "Defendant"), as follows:

## **NATURE OF CASE**

1.     This is an action by the Permanent Receiver and the Joint Official Liquidators ("JOLs," together with the Permanent Receiver, "Plaintiffs") against Duff & Phelps for its multiple failures to accurately value the investments DLI managed and for its complicity in the breaches of fiduciary duty committed by Brendan Ross ("Ross") and entities controlled primarily by him. Specifically, the Plaintiffs bring claims of professional negligence, gross negligence, aiding and abetting breach of fiduciary duty, negligent misrepresentation, and breach of contract.

2.     As described in further detail below, DLI hired Duff & Phelps to provide valuations of DLI's investments. Duff & Phelps provided quarterly valuation ranges for DLI's assets beginning in October 2016 and monthly valuation reports beginning in October 2018. From the outset of its engagement and through January 2019, Duff & Phelps significantly overvalued DLI's investments, despite having the information necessary to perform accurate valuations. The Plaintiffs estimate that as of November 2018—with Duff & Phelps's valuation support—DLI's net asset value was overstated by at least $459.4 million. At times, it seemed as if the sole goal of Duff & Phelps was to prop up DLI's internal overvaluations, thereby engendering goodwill and preserving an income stream in the form of professional service fees

COMPLAINT

from DLI. Duff & Phelps pursued this goal at the expense of faithfully carrying out its legal duties, eventually causing harm to Plaintiffs and contributing to the collapse of the Receivership Entities and DLIFF.

3. Duff & Phelps's overvaluations were used to increase the amount of commissions Ross paid himself out of investor funds. Duff & Phelps's participation as DLI's valuation firm was used to lend credibility and respectability to DLI and its overvaluations. Duff & Phelps was aware that DLI touted that the internal overvaluations DLI reported to DLI's investors were subject to "independent" third party valuations performed by Duff & Phelps. Ultimately, the overvaluations were a substantial factor in creating the circumstances that forced DLI into Receivership and caused hundreds of millions of dollars in losses to Plaintiffs and DLI's investors. By this action, the Plaintiffs seek to recover damages from Duff & Phelps for the benefit of the Receivership Entities and DLIFF.

## THE PARTIES

4. Plaintiff Bradley D. Sharp is the Permanent Receiver for the Estate of Direct Lending Investments, LLC, Direct Lending Income Fund, L.P., Direct Lending Income Feeder Fund, Ltd., DLI Capital, Inc., DLI Lending Agent, LLC, and DLI Assets Bravo, LLC and their successors, subsidiaries, and affiliated entities ("the Receivership Entities").

5. Plaintiff Bradley D. Sharp is also a duly appointed Joint Official Liquidator of DLIFF with authority pursuant to orders of the Grand Court of the Cayman Islands and the United States District Court for the Central District of California to liquidate the assets of DLIFF and bring litigation on its behalf.

6. Plaintiff Christopher D. Johnson is a duly appointed Joint Official Liquidator of DLIFF with authority pursuant to orders of the Grand Court of the Cayman Islands to liquidate the assets of DLIFF and bring litigation on its behalf.

7. Plaintiff Bradley D. Sharp is a federally appointed receiver acting pursuant to Federal Rule of Civil Procedure 66, the provisions of 28 U.S.C. §§ 754,

2

959, and 1692, as well as this District Court's April 1, 2019 Preliminary Injunction and Order Appointing Permanent Receiver ("Receivership Order") in the United States District Court for the Central District of California, Case No. 2:19-cv-02188-DSF-MRW, *Securities and Exchange Commission v. Direct Lending Investments, LLC*, Docket Number 10 ("Enforcement Action").

8.     The Court appointed the Permanent Receiver to marshal and preserve all assets of the Receivership Entities. The Permanent Receiver is authorized and empowered to investigate claims and commence legal actions for the benefit and on behalf of the Receivership Entities as the Permanent Receiver deems necessary and appropriate. The Permanent Receiver brings this action for the benefit and on behalf of DLI, DLIF, DLIFF, and DLI Capital, Inc., as described below.

9.     The Cayman Court appointed Bradley D. Sharp and Christopher D. Johnson as JOLs and authorized them to investigate claims and commence claims for the benefit and on behalf of DLIFF, as they deem necessary and appropriate.

10.     Duff & Phelps, LLC, is a Delaware limited liability company headquartered at 55 East 52nd Street, New York, New York 10055, with offices in multiple cities throughout the United States, including Los Angeles.

## **RELATED PARTIES**

11.     Direct Lending Investments, LLC ("DLI") is a registered investment advisor, and the general partner of DLI Capital, Inc. (the "Master Fund"), and was responsible for the investment of the Master Fund's assets. DLI employed a complex master-feeder fund structure and was the investment manager of the feeder funds, Direct Lending Income Fund, L.P. ("DLIF") and Direct Lending Income Feeder Fund, Ltd. ("DLIFF") (collectively with DLIF and the Master Fund, the "Funds"). DLI's principal place of business was in Glendale, California. DLI's sole member, Brendan Ross, is an individual residing in the County of Los Angeles.

12.     DLIF was organized as a Delaware limited partnership on September 21, 2012 to operate as a private investment partnership. DLI was the general partner

3

of DLIF, and Ross was the Chief Executive Officer of DLIF. A number of the limited partners reside in the State of California, in Los Angeles County.

13.     The Master Fund is a Nevada Corporation with its principal place of business in Glendale, California.

14.     DLIFF, a Cayman Islands company, was formed to facilitate investments from non-United States domiciled investors.

15.     DLIF and DLIFF, directed by DLI, invested in a combination of loans and equity in the Master Fund.  The Master Fund, directed primarily by DLI, also invested in investments through DLI Assets, LLC, a Nevada limited liability company, DLI Assets Bravo LLC, a Nevada limited liability company, and DLI TC, LLC, a Delaware limited liability company.

16.     DLI Lending Agent, LLC is a Delaware limited liability company that served as administrative agent with respect to a number of the credit facilities with counterparties in which DLI invested, facilitating the collection of payments, and serving as intermediary between borrowers and lenders.

17.     Ross was the founder, 100% owner, managing member, and Chief Executive Officer of DLI, and a member of the board of directors.

18.     DLI also was advised by a Board of Directors consisting Ross, DLI's Chief Investment Officer and two outside directors.

## **VENUE AND JURISDICTION**

19.     The Permanent Receiver, Bradley D. Sharp, is a resident of Orange County, California and the duly-appointed federal Permanent Receiver authorized by order of the United States District Court for the Central District of California to marshal and liquidate the assets of DLI, and the other Receivership Entities, and to bring litigation on their behalf.

20.     The amount in controversy exceeds this Court's jurisdictional limit of $75,000.

*///*

COMPLAINT

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the acts and conduct that form the basis of Plaintiffs' causes of action occurred when DLI fraudulently offered investments for sale from its headquarters in Glendale, California, in Los Angeles County, within this District, and conducted the business of the funds, with the assistance of Duff & Phelps.

22.     This Court has jurisdiction over this proceeding under 15 U.S.C. § 77v(a), and 15 U.S.C. § 78aa because the proceeding is ancillary to the case *Securities and Exchange Commission vs. Direct Lending Investments, LLC*, presently pending before the United States District Court as Case No. 2:19-cv-2188-DSF-MRW.

23.     This Court also has jurisdiction over the Defendant because it purposefully availed itself of the benefits of this state by doing business in the State of California such that the United States District Court of California may exercise personal jurisdiction over it, including by providing valuation services to DLI, which was headquartered in Los Angeles County, California, within this District.

## FACTUAL ALLEGATIONS

24.     DLI is a limited liability company formed in 2012 under the laws of the State of California, with its principal office in Glendale, California. It was founded by Ross, who was the 100% owner of DLI and the Chief Executive Officer of DLI until his resignation on March 18, 2019.

25.     DLI's purported initial investment objective was to net for its investors an annualized 10% to 14% return. It advertised that it could achieve those returns by investing in short-term loans, lines of credit, purchased receivables, or other debt obligations. It focused on loans that originated through online lending platforms.

26.     In its early private placement memoranda, DLIF stated to potential investors that the loans in which it invested typically had the following qualities: 1) issued by qualified, established businesses; 2) durations of six to eighteen months; 3) fully amortizing over the term through daily or weekly ACH withdrawals from the

5

borrower's account; 4) may be guaranteed by one or more principals, and 5) may be secured by the assets of the borrower.

27.    In its initial period of operation, DLI was not registered with the United States Securities and Exchange Commission ("SEC") as an investment advisor, and its assets under management fell below the $100 million threshold for registration. As such, DLI, which supposedly marketed itself to high-net-worth accredited investors, was able to avoid regulatory scrutiny regarding the initial period of its operation.

28.    By December 2014, DLI's assets under management had reached $100 million. By January 1, 2015, the assets under management had grown to $118 million. Yet DLI failed to register with the SEC as a registered investment adviser.

29.    As a result, DLI was able to continue to operate without scrutiny and oversight by the SEC and its investors were deprived of the protections afforded by the Investment Advisers Act.

30.    Finally, on February 1, 2016, DLI registered with the SEC as an investment advisor.

31.    DLI advised the Master Fund, which was a vehicle through which two private investments funds invested:  an on-shore fund, DLIF; and an off-shore fund, DLIFF.

32.    According to its last SEC filing on February 25, 2019, DLI had 27 employees and $866 million in regulatory assets under management.

33.    DLI was controlled in significant part by Ross, who was one of two members of DLI's board of directors, along with DLI's Chief Investment Officer. Ross also primarily controlled DLIF, DLIFF, and the Master Fund. Ross held ownership stakes in a number of counterparties, which were not made public or were concealed through stakes held by family members or family trusts. Because of Ross' equity interests, DLI was not in fact truly independent of these borrowers, and the transactions in which DLI invested were influenced by Ross's personal interests.

COMPLAINT

34.     The majority of the assets in which DLI invested were Level 3 assets, meaning that they were illiquid, and could not be valued through observable measures, such as market prices. The assets were supposed to be valued at fair market value. DLI valued the positions internally, on a monthly basis. Through this internal valuation process, which was largely controlled by Ross, DLI artificially inflated DLI's asset values, and in turn, overvalued the fund.

35.     DLI charged clients a monthly management fee, based on 1% of the Master Fund's gross asset value, plus beginning of the month subscriptions minus redemptions. In addition, DLI charged a performance fee when the Master Fund's net asset value exceeded its prior high net asset value, at the rate of 20% of these earnings before interest and taxes. The net asset value of the Master Fund also served as the basis for calculating monthly returns reported to current and prospective investors. When DLI's portfolio was overvalued, excess fees were charged due to the way that the fees are calculated.

36.     At all relevant time periods, many of DLI's investment platforms were in financial distress, but DLI's looming financial difficulties were hidden from most of DLI's investors. Duff & Phelps supported this continued charade by providing superficial and unreasonably optimistic valuations of those distressed platforms.

**Duff & Phelps's Involvement**

37.     In 2016, Ross sought to grow the size of DLI's assets by gaining investments from "true domestic institutional investors." When he would brainstorm with others how to make that happen, the concept that such investors would require a third-party valuation of DLI's assets was routinely raised. Ross concluded that DLI could address that "without a ton of pain" and immediately identified Duff & Phelps as the valuation firm that suited DLI's needs.

38.     Those needs, from Ross's perspective, were not exactly what one might usually consider when thinking of third-party valuations. In August 2016, before DLI contacted Duff & Phelps, Ross expressed DLI's needs in the following way: "Ideally

COMPLAINT

the way this work [*sic*] is that Duff & Phelps will validate our own valuations, not in real-time, but as a kind of audit function on a quarterly basis."

39.    Ross described this approach as a "double-check" and when comparing it to a true independent valuation, he said, "This is probably more convenient, but it does create something of a problem in that if they were to find a material difference we'd be in a world of pain trying to restate."

40.    Ross was not eager about having a third party perform actual independent valuations. He described the process as "annoying" and stated that he would like to avoid it.

41.    Ross's words here are notable because they capture his underlying desire to have Duff & Phelps's valuations merely mimic DLI's valuations and to avoid having to alter its valuations. Ross sought a "yes man" from a third-party valuation firm, and Duff & Phelps gladly took on that role. From the beginning, Duff & Phelps knew that DLI, as primarily controlled by Ross, sought to have its valuations rubber stamped, and it tailored its approach to satisfy DLI.

42.    After retaining Duff & Phelps, DLI began attempting to capitalize on the hire by broadcasting to potential investors in its private placement memoranda that it had a valuation firm in place.

43.    Further, DLI began directly informing its investors about Duff & Phelps's role in its regular letters to investors.

44.    In DLI's February 2017 investor letter, DLI introduced Duff & Phelps: "Finally, to complement our comprehensive internal valuation approach, we have retained Duff & Phelps, a global leader in valuation consulting, to provide quarterly valuation ranges for the fund's assets. Using their independently formulated valuation range at the portfolio level, we validate our own methodology. Beyond simply confirming that our own valuations fall within their given range, we openly discuss discrepancies and conclusions with their team. Through this open dialogue on the analysis and inputs employed, we adapt our own process over time."

COMPLAINT

45.     Duff & Phelps initially provided valuation reports quarterly. That eventually changed to monthly, and coinciding with that change, in its October 2018 investor letter, DLI once again touted Duff & Phelps's involvement: "As you may know, the Funds work with Duff & Phelps and Lincoln International to provide an independent valuation of each of the Fund positions. Duff is one of the preeminent firms in the third-party valuation space, with over 3,500 professionals in 28 countries. Lincoln is also widely respected, having 500 employees across 20 countries. The reporting we receive from Duff and Lincoln shows a valuation range for each Fund investment. We use these third-party valuations to provide independent support for our internal valuation methodologies and conclusions. These reports are also made available to the Funds' auditors, Deloitte."

46.     The following month, when DLI shared its purported monthly return with its investors, it directly linked it to Duff & Phelps's valuation: "We have received our third-party valuation reporting from Duff & Phelps and Lincoln Partners, and we are able to confirm our previous estimate of 0.75% for the month ending October 31, 2018 is the final performance return for that month."

**<u>The Engagement Letter</u>**

45.     DLI and Duff & Phelps entered into an engagement letter on October 26, 2016 (the "Engagement Letter"). At the outset, Duff & Phelps clearly acknowledged that its valuation services were "being provided in conjunction with [DLI's] preparation and timely completion of certain reporting requirements."

46.     In the Engagement Letter, Duff & Phelps promised that it would apply its judgment, in consultation with DLI's management, to generate a range of fair value estimates for DLI's investments. Duff & Phelps further promised to assess the reasonableness of DLI's internal cash flow estimates for the investments and that it would ask for facts and circumstances necessary for the analysis. Duff & Phelps approved DLI's calculations and estimates without using professional judgment and accepted DLI's unreasonable cash flow estimates.

9

47.     Duff & Phelps further agreed that it would use and rely upon not just information provided by DLI, but also information obtained from various public, financial, and industry sources. It is not apparent from the reports generated by Duff & Phelps that it regularly used and relied upon external sources of information.

48.     In preparing its estimates of fair values, Duff & Phelps agreed that it would use the definition of "fair value" provided by Accounting Standards Codification ("ASC") §820 (formerly Statement of Financial Accounting Standards No. 157, Fair Value Measurements). That definition of fair value is "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." Duff & Phelps did not adhere to this covenant. As described further herein, DLI and Duff & Phelps drastically overvalued various of DLI's investments without concern as to the price that a market participant would buy or sell the investment.

49.     In the Engagement Letter, Duff & Phelps represented what tasks would be undertaken in its provision of valuation services to DLI. Among the notable tasks that Duff & Phelps represented that it would undertake are the following:

- Meet with relevant members of Management to discuss the valuation and related write-ups, to understand your [DLI's] expectations and intent regarding the Investment, their underlying strategy and performance; and to discuss any relevant updates.

- Consider general economic and industry trends and the impact they may have on the Investment.

- Consider certain other information that is public or supplied by Management that would be relevant to our analysis.

- Review of historical and most recent audited financials, business plans, and management presentations (if available).

- Review individual investment legal documentation.

- Develop an understanding of the terms, rights and priority of all Investment(s) and the terms to any external capital structure applied.

COMPLAINT

- Develop a comprehensive understanding of performance metrics, including but not limited to: delinquency, default, recovery, and prepayment ratios; trends in credit migration; as well as other industry-specific performance metrics.

- Consideration of the Investment's performance relative to cohort-based expectations at origination.

- Assessment of key developments (i.e., any proposed transaction).

50.     Duff & Phelps failed to meet its obligations in several key respects. As described further below, Duff & Phelps (i) failed to perform the procedures outlined in its Engagement Letter in the preparation of its valuations; (ii) made material mistakes and incorrect statements in the valuations; (iii) made gross errors in methodology and conclusion of value as to numerous DLI Investments that resulted in massive overstatement of the value of DLI's investments; and (iv) failed to identify, discuss, disclose, analyze, or account for material risks to DLI's investments even when Duff & Phelps was aware of those risks or was asked to opine on them.

**Duff & Phelps's Valuation Reports**

51.     Duff & Phelps charged $3,000 per platform per quarter. Its first valuation was for the period ending on September 30, 2016. In October 2018, it shifted to monthly valuation reports, with its last report being for the period ending on November 30, 2018. After the shift to monthly valuations, Duff & Phelps charged $2,000 per platform. Duff & Phelps also performed two annual valuations of DLI, for which it charged $13,500 per valuation. In total, Duff & Phelps prepared 10 valuation reports and charged DLI $664,000 in fees from 2016 to 2018.

52.     Despite the fact that Duff & Phelps was the valuation expert, it showed a willingness to be guided by DLI and to alter its methodology to meet DLI's expectations.

53.     For example, early on in the engagement, in December 2016, Duff & Phelps chose to follow DLI's thinking regarding forecasting cash flows at a single

COMPLAINT

loss rate, rather than performing analysis at the loan level. Ultimately, Duff & Phelps accepted DLI's approach of modelling its valuation with a zero loss assumption— without using its professional judgment to determine independently whether that was reasonable under the circumstances of each platform.

54.     Whenever Duff & Phelps suggested a range of fair values that did not comport with DLI's valuations, Duff & Phelps would work internally to identify what it could do to bring its valuations into DLI's predetermined ranges before preparing a draft valuation report. On one occasion, Duff & Phelps decided to delete various discount rate information as "not supportive/too low."

55.     Bizarrely, Duff & Phelps would circulate drafts of each of its valuation reports to DLI so that DLI could comment on not just the range of fair values and the methodology Duff & Phelps used to calculate such ranges, but even the actual language used in the reports to describe the platforms and their risks. DLI would frequently push Duff & Phelps to alter something to change the valuations.

56.     Duff & Phelps was provided with detailed financial data regarding each of the investment platforms on a regular basis, including the legal documents creating the various loans and investments. If it ever determined that it needed anything else to perform a valuation analysis, DLI would provide it. Despite this access, Duff & Phelps still managed to dramatically overvalue many of DLI's problematic platforms.

57.     During the report preparation and revision process, DLI would at times call Duff & Phelps's attention to issues with its investments that Duff & Phelps did not effectively address. Other times, Duff & Phelps would observe something troublesome with DLI's investments, – for example, QuarterSpot's "large number of defaulted loans" (which is discussed further below) or that the accrued interest balances as a percentage of current balance for another investment was "peculiar" – but it would not act upon those observations by appropriately adjusting its valuation of the investments downward.

COMPLAINT

58.     After receiving DLI's comments on Duff & Phelps's reports, Duff & Phelps would discuss whether DLI was happy or not and what valuations DLI wanted to be even higher.

59.     When Duff & Phelps eventually finalized its valuation reports, it represented within them that it had conducted its analyses in a manner that it obviously did not. In addition to repeating that it had calculated the "fair value" of DLI's investments in accordance with ASC §820, it made the following untrue statements, among others:

- That it had verified the structure and logic of each model and analyzed all assumptions to ensure that they provided an adequate representation of risks;
- That it had analyzed all assumptions in light of actual and potential risks and assessed the relevance of each change in assumptions;
- That it had analyzed all assumptions in light of actual performance of the collateral; and
- That it had developed an appropriate valuation approach based on each Investment's characteristics and structure.

60.     At all relevant times, there were individuals within the Receivership Entities and DLIFF who were not involved with the intentional improper acts and who were not aware of the full facts and circumstances described herein (the "Innocent Insiders"). Had the Innocent Insiders been aware of the intentional improper acts and/or of the full facts and circumstances described herein that Duff & Phelps overlooked, including but not limited to the gross overvaluation of assets, the Innocent Insiders would have taken action to protect the interests of the Receivership Entities and DLIFF and would have implemented changes to prevent them from sustaining further damages.

**VoIP**

61.     VoIP was engaged in telecom factoring, the purchasing of receivables of

COMPLAINT

small "Tier 3" telecom providers, which purportedly had contracts with and receivables due from "Tier 1" telecom providers.

62.   DLI first invested in VoIP in 2015, providing $32.83 million as of December 31, 2015, to VoIP on a $50 million revolving loan facility. Over the next three years, the loan facility increased with balances at fiscal year-end for 2016 and 2017 of $99 million and $180 million, respectively. By February 2019, the principal loan balance was $191.3 million, representing approximately 25% of DLI's aggregate net asset value.

63.   VoIP began to fail in 2017, when a Tier 1 provider—BT Nederlands — withheld a $20 million payment from a Tier 3 provider that was factoring its receivables with VoIP due to suspicions that the Tier 3 provider was faking calls and engaging in money laundering. This caused VoIP to be unable to repay that portion of DLI's loan.

64.   Despite the fact that DLI initially appraised the VoIP loans as being at a low risk of default due to the thought that Tier 1 providers would always pay, DLI and Duff & Phelps did not lower the valuation, and DLI kept lending money to VoIP.

65.   In its valuation reports, Duff & Phelps concluded that the payments to DLI are "guaranteed by large Tier 1 telecommunications carriers." But Duff & Phelps named none of these supposed Tier 1 companies nor identified any analysis of the amounts owed by each Tier 1 or the basis for its conclusion that such companies were credit worthy.

66.   Duff & Phelps's report as of March 31, 2018, claimed that VoIP's performance is "guaranteed by large Tier 1 telecommunications carriers" that have "strong credit" and contains no disclosure of the $21 million default arising from BT Nederlands nor any indication that Duff & Phelps evaluated the creditworthiness of the purported Tier 1 parties.

67.   Duff & Phelps did not address the BT Nederlands situation in reports until its September 2018 report, and what it did include was misleading. Duff &

14

Phelps identified for the first time that VoIP has had an unpaid receivable of $21 million, but failed to indicate that it had been outstanding since early 2017. Duff & Phelps also conceded that DLI put the $21 million receivable on non-accrual starting in March 2017, but never explained why Duff & Phelps failed to include that fact in any of its prior valuations. Yet again, Duff & Phelps chose to abandon professional judgment and continued to model VoIP with a "zero loss assumption."

68.    By the end of 2018, two purported Tier 1 providers—Indigo11 and iKarim—began paying more slowly than usual. These providers eventually stopped making payments altogether and disappeared, together owing over $160 million. In December 2018, VoIP ceased making payments to DLI.

69.    VoIP ceased paying DLI in late 2018, and VoIP later filed for Chapter 7 bankruptcy. The bankruptcy filing followed several years after the start of an active criminal investigation. The criminal investigation led by the Netherlands prosecutor of VoIP's telecommunication business and counterparties, ultimately led to criminal charges against VoIP, its principal, Rodney Omanoff, and associates.

70.    The Plaintiffs estimate that as of November 2018, the effective date of Duff & Phelps's last valuation report, DLI and Duff & Phelps had overvalued DLI's investment in VOIP by $192.6 million.

**Investments H and I[1]**

71.    Consumer Loan Parent is a consumer finance company specializing in point-of-sale financing. DLI made two investments involving Consumer Loan Parent, and both were complete failures. First, Consumer Loan Parent promised DLI a 16% return on a preferred equity investment in a joint venture ("Consumer Loan

---

[1] The identities of certain counterparties and borrowers have not been disclosed to avoid prejudicing Plaintiffs' negotiations, restructuring, and collection attempts. Duff & Phelps is well aware of the specific identity of the unnamed counterparties and borrowers described in this Complaint.

COMPLAINT

JV") that would purchase consumer loans. (DLI's equity investment in Consumer Loan JV is referred to herein as "Investment I"). But the promised 16% return far exceeded the earnings from the loans the Consumer Loan JV purchased. Consumer Loan Parent, through an affiliate, was supposed to pay the difference between Consumer Loan JV's actual profits and the promised return to DLI. Instead, as Consumer Loan Parent lost money, it obtained a corporate loan from DLI to cover its losses (DLI's Corporate loan to Consumer Loan Parent is referred to herein as "Investment H"). But Consumer Loan Parent did not earn enough to repay the loan from DLI. Consumer Loan Parent tried to loan its way out of this downward spiral by borrowing more and more money from DLI, but it never succeeded, and the size of Investment H simply grew larger.

72.    Duff & Phelps's valuations of DLI's Investment H in Consumer Loan Parent reflect an extraordinary degree of incompetence. Far beyond mere professional negligence, Duff & Phelps's work product reflected a total lack of care or competence.

73.    For example, in its first valuation as of September 30, 2016, Duff & Phelps correctly noted that DLI had a corporate loan to Consumer Loan Parent and an equity investment in Consumer Loan JV, but then Duff & Phelps wrongfully combined those two into a single investment and failed to disclose or account for the differing risks and values associated with each, despite one being a corporate loan to a parent entity and one being an equity investment in a joint venture that purchased loans.

74.    Despite obtaining financial information on Consumer Loan Parent showing significant losses, Duff & Phelps provided no separate valuation of DLI's corporate loan to Consumer Loan Parent in many of its valuations. Duff & Phelps further assumed that Consumer Loan JV would always pay the guaranteed return on DLI's preferred equity investment in Consumer Loan JV without any analysis of whether the purported guarantor had the ability to honor such guaranty. It didn't.

COMPLAINT

75.     Duff & Phelps also modeled its valuation on an assumed stream of cash payments to DLI without any consideration of DLI's agreement not to receive cash returns on its joint venture investment for several years and despite the fact that the majority of interest owed on Investments H and I was never paid in cash but simply capitalized. Yet Consumer Loan Parent operated at a substantial loss even while paying DLI only a small portion of the total interest owed.

76.     Duff & Phelps's failures to evaluate appropriately DLI's position in Investments H and I led to a massive overvaluation. The Plaintiffs estimate that as of November 2018, the effective date of Duff & Phelps's last valuation report, DLI and Duff & Phelps had overvalued DLI's investment in Investments H and I by at least $141.8 million.

**Investment M**

77.     Investment M is a company that was formed in 2017 specifically to obtain financing from DLI. It acquires and enforces patent rights through litigation— it is what is colloquially and pejoratively known as a "patent troll."

78.     DLI and Investment M entered into a credit agreement on May 5, 2017, that permitted Investment M to borrow up to $100,000,000 from DLI with a loan-to-value ratio of 80%. At a glance, the credit agreement entered into by the parties appears standard with regard to its basic nature: DLI would lend money to Investment M in an amount collateralized by Investment M's assets. The assets were Investment M's patents, and Investment M could borrow up to 80% of their value. Consequently, how Investment M's patents were valued is a crucial detail that directly dictated whether DLI could lend money to Investment M.

79.     Initially, DLI lent Investment M $15,000,000 to purchase an existing patent portfolio from Investment M's owner. The original cost-basis for those 55 patents was approximately $1,300,000. DLI saw fit to loan just over 10 times that cost basis to Investment M—$15,000,000—which Investment M immediate put into its owner's pockets.

COMPLAINT

80.     On August 2, 2017, DLI and Investment M amended the credit agreement for the first time. Among other changes, the amendment allowed DLI to decide in its discretion to allow Investment M to pay interest and other waterfall costs out of the interest reserve account, allowing Investment M to chug along and satisfy the payment requirements of the credit agreement even if it were not taking in revenue.

81.     Approximately a year later, on August 31, 2018, the parties amended the credit agreement a second time. This was an even more dramatic change than the first amendment. It permitted Investment M to use loan proceeds not just for patent infringement litigation costs for the first time, but also, it also permitted Investment M to use loan proceeds to pay the interest on the loan. In other words, Investment M was permitted to borrow money from DLI to pay its obligations to DLI, making a default by Investment M a virtual impossibility.

82.     Duff & Phelps noted both amendments in its valuation reports, but the mentions were mere window dressing. It described the first amendment entirely superficially, completely missing what impact the amendment could have on Investment M's borrowing, and more importantly, what the amendment suggested was the current state of Investment M's financial affairs.

83.     Shockingly, even though it reviewed the second amendment, Duff & Phelps simply cut-and-pasted its previous superficial language from its description of the first amendment, making its description entirely incorrect. Duff & Phelps was aware that Investment M was borrowing money from DLI in order to be able to make its required payments to DLI and made no adjustments to its analysis. In fact, it continued to repeat the same hollow words about how Investment M "continues to perform and has maintained compliance since origination" even though it had earned no significant revenue and was capitalizing its interest payments.

84.     While Investment M's efforts were initially wholly confined to the United States, after it began its relationship with DLI, foreseeable changes to U.S.

18

COMPLAINT

law forced it to shift its patent enforcement strategy almost entirely to China shortly after the loan was initiated. Subsequently, Investment M transferred much of its U.S. patent portfolio to third parties for no consideration.

85.     DLI apparently decided to treat this massive change to Investment M's business model as one that did not require any new scrutiny. It does not appear that DLI altered its valuation of Investment M in any real way. Likewise, despite the fact that China was developing its intellectual property legal system and that there was no real data to which one could look to predict the results of future litigation efforts, Duff & Phelps rubber-stamped DLI's valuations, even modelling DLI's portfolio with a zero loss assumption.

86.     DLI had no experience in litigation funding, and it had no familiarity with investing in or in assigning values to intellectual property. Despite DLI characterizing the patents owned by Investment M as collateral, it did not assign value to those patents based upon a traditional fair market value, but rather, an assigned value based upon a prediction about how much Investment M could receive in a settlement from an alleged infringer. DLI assigned values to the patents based upon one overriding principle: historical performance by Investment M's management supported the prediction that management will continue to have good judgment in selecting what patents to acquire. Duff & Phelps apparently latched onto this concept and asked DLI to see Investment M's owner's historical track record.

87.     In fact, Duff & Phelps incorrectly determined that Investment M was overcollateralized and reduced the discount rate it chose to apply to its predicted cash flows by 1%, further increasing its valuation of DLI's loan portfolio. Duff & Phelps elected to accept wholly patent valuations from another firm, which admitted on their face that they were superficial and disclaimed reliability by noting that the firm "has not analyzed the patents or the claim charts with any significant level of detail."

88.     In looking at DLI's predicted cashflows from Investment M, the only way Duff & Phelps was able to accept them was to ignore that DLI was lending the

money to make the predicted payments and to assume that when the credit facility matured, Investment M would refinance with someone else and pay off the amount owed to DLI.

89.    Duff & Phelps used various benchmarks to calculate its range of fair values, but it applied poor judgment or no judgment in choosing the benchmarks, instead applying whatever helped it reach its predetermined conclusions. It used identical benchmarks for both the Biz2Credit platform and the Investment M platform, with identical weightings. This makes little sense. Biz2Credit provided online credit to small businesses, collateralized by their future receivables; Investment M was a litigation funding company that attempted to monetize patents through litigation.

90.    From Between May 2017 and September 2018, DLI lent almost $60,000,000 to Investment M. At the time that the Permanent Receiver was appointed over DLI, Investment M owed approximately $57,000,000 in principal, plus interest of approximately $8,900,000—a total of approximately $66,000,000. The Plaintiffs estimate that as of November 2018, the effective date of Duff & Phelps's last valuation report, DLI and Duff & Phelps had overvalued DLI's investment in Investment M by at least $52.1 million.

**QuarterSpot**

91.    QuarterSpot, Inc. ("QuarterSpot") was an online small business lender. DLI funded thousands of QuarterSpot loans and was entitled to the principal and interest payments made by the underlying borrowers, subject to QuarterSpot taking a servicing fee that was a set percentage of the loan interest collected each month.

92.    QuarterSpot was not sustainable due to a high default rate on the underlying loans. To disguise QuarterSpot's defaults, Ross falsely reported returns. Specifically, Ross concealed the performance of the loans by falsifying payment figures to make it appear that payments had been made by borrowers when they had not been. He secretly directed QuarterSpot, as part of its monthly reporting to DLI, to

"rebate" a portion of its servicing fees by making payments to DLI, giving the false impression that borrowers were making principal payments on seriously delinquent loans.

93.     Under DLI's valuation policy, many of these non-performing loans should have been marked down 50% or 100% but instead were valued at par because of the false payments.

94.     As a result, between spring 2014 and fall 2017, DLI cumulatively overstated the valuation of the QuarterSpot position by at least $53 million and materially misrepresented its returns. DLI collected at least $5-6 million in extra management and performance fees from the Funds that it would not have otherwise been able to collect.

95.     In March 2019, upon discovering Ross's misconduct with respect to QuarterSpot after an internal investigation, a committee of senior DLI executives demanded that Ross formally resign and relinquish control of DLI, to which he acquiesced.

96.     Duff & Phelps observed red flags in QuarterSpot's loan tapes, even noting at one point that various loans were changed from being described as in default to merely just late. Duff & Phelps failed to alter its analysis in the face of these red flags.

97.     In December 2016, Duff & Phelps circulated its draft report. DLI asserted that Duff & Phelps made a mistake relating to QuarterSpot, because DLI showed $1.7 million in defaults while the Duff & Phelps report showed $14.5 million in defaults. DLI ultimately suggested that it gave the wrong loan tapes to Duff & Phelps, and provided updated tapes, claiming that QuarterSpot tracked down a "handful of payments" that were scheduled to post on a bank holiday.

98.     After Duff & Phelps used the revised data, its valuation went up, and it observed internally that DLI would "be pretty happy with that change."

///

COMPLAINT

99.     Again, Duff & Phelps willingly chose to ignore the writing on the wall and did not appropriately account for the risk associated with the platform. Instead, Duff & Phelps stated that "it [QuarterSpot] sounds like the issues appears [*sic*] to just be a 'reporting issue with a young/growing platform.'"

**Investment TS**

100.  Investment TS is a Los-Angeles based "fix and flip" real estate acquisition company that has worked in distressed real estate assets since 1985. Investment TS was one of the largest investments made by DLI.  It also represented one of the most significant departures from DLI's stated investment philosophy of generating current income through small business loans.

101.  In July 2015, DLI committed $100,000,000 to Investment TS, and despite slow repayments and deficient collateral, it accelerated its credit commitment to Investment TS over time. Specifically, DLI loaned more than $230,000,000 to Investment TS, through two special vehicles: Investment T and Investment S (collectively, the "Investment TS Facilities").

102.  Investment T supposedly was secured by the collateral of the residential real estate "fix and flip" properties, and a personal guaranty from Guarantor in the amount of $100 million. Other than accepting the guaranty from Guarantor, DLI appears to have done little due diligence into Guarantor's ability to pay at the time of its commitments.

103.  Duff & Phelps rubber-stamped DLI's overvaluation of Investment TS by (1) ignoring or providing excuses for Investment TS's poor financial condition; (2) failing to consider whether there was a realistic chance that Investment TS would repay its loans to DLI; and (3) blindly and erroneously relying on Guarantor's ability to cure Investment TS's under-collateralization.

104.  There were obvious red flags relating to Investment TS's financial condition. Most notably, Investment TS's capitalized interest was added to its loan principal, its collateral was overvalued, it experienced declining sales, and it was

COMPLAINT

using funds supplied by DLI to acquire more properties as its other properties aged.

105.   By April 30, 2016, Investment T's balance sheet reflected a net loss of $13,217,006.11 and accrued interest of $7,684,726.97. Investment T's financial picture was worsening, and the likelihood that Investment TS was going to repay the facility was diminishing.

106.   Despite Investment T's worsening financials, Duff & Phelps's valuation as of September 30, 2016, painted an optimistic picture. Duff & Phelps stated, "D&P's analysis of Investment TS's historical return on investment suggests that a loss is highly unlikely." Duff & Phelps further stated that (1) Investment TS typically had a five- to six-month turnover of properties and 25 to 35 percent annualized returns, and (2) Investment TS's principal had personally guaranteed the loans "with his substantial assets." However, Duff & Phelps's description of Guarantor's assets as "substantial" was vague and without foundation. An asset check of Guarantor would have revealed that Guarantor lacked the liquid assets to support the guaranty.

107.   By December 31, 2017, Investment S's financial statements should have raised red flags. Specifically, Investment S's audited financial statements for 2017 reflected a member deficit of -$4,574,216. Furthermore, Investment S's sales from May 30, 2017 through December 31, 2017 were $29,766,445, and its expenses were $34,110,040, for a net loss of $4,343,595. Moreover, in its Statement of Cash Flows for the same period, cash flows from operating activities were -$4,343,595, and net borrowing from the revolving line of credit was -$107,588,045. The net increase in cash from financing activities was $2,713,826.  In other words, Investment S's cash was coming from financing, not operations.

108.   Despite the availability of financial documents illustrating Investment S's financial condition, Duff & Phelps simply stated in its valuation as of September 30, 2017, that it "considered the proximity of the funding date to the Valuation Date" and that "[given] only a few months have elapsed since the funding date, and significant cash floor surveillance is not yet available, D&P has valued the

[Investment S] Fund Portfolio on a cost basis."

109.   Throughout its engagement with DLI, Duff & Phelps's valuations took shortcuts and ignored or excused red flags related to Investment TS's poor financial condition. In fact, there were instances in which Duff & Phelps simply copied statements from one report to another. For example, the aforementioned statement regarding Guarantor's "substantial assets" appeared in Duff & Phelps's valuations until its final valuation, dated November 30, 2018, with no apparent attempts to confirm or update the statement's accuracy. As an example of excusing Investment TS's poor financials, Duff & Phelps acknowledged in its report that although the Investment TS Facilities were undercollateralized, the guarantor "is currently working in good faith to resolve this situation with a solution that may include, among other things, adding additional collateral, sale of properties, and/or monetization of other personal assets of the guarantor." Despite this statement, it does not appear that Duff & Phelps examined whether the listed means to cure the under-collateralization were viable.

110.   Duff & Phelps's valuation analysis should have raised alarms relating to Investment TS. Instead, bolstered by Duff & Phelps's valuations, DLI continued to pour significant amounts of its investors' funds into Investment TS. The Plaintiffs estimate that as of November 2018, the effective date of Duff & Phelps's last valuation report, DLI and Duff & Phelps had overvalued DLI's investment in the Investment TS Facilities by $48.5 million.

## COLLAPSE OF DLI AND THE FUNDS AND SUBSEQUENT RECEIVERSHIP

111.   On February 11, 2019, DLI informed investors that DLIF and DLIFF had suspended withdrawals and redemptions effective February 8, 2019. DLI cited the delinquency of the VoIP obligor payments on a $192 million loan as the reason for the suspension. For the first time, DLI informed investors that the Dutch government had been investigating VoIP since 2017, and that the cessation of

24

COMPLAINT

payments was likely a result of undetermined misconduct, that a substantial portion of the outstanding $160 million loan balance might not be recoverable.

112. On March 19, 2019, DLI informed investors that another of its positions, QuarterSpot, may have been materially overstated for a period of years. DLI further disclosed that following DLI's management committee's request that he take a leave of absence, Ross had formally resigned all of his positions with DLI on March 18, 2019, and ceded control to the management committee.

113. The acts and omissions of Duff & Phelps contributed to the SEC's filing of the Enforcement Action against DLI in March of 2019.

114. The SEC's complaint against DLI alleged that DLI had engaged in a multi-year fraud—perpetuated through Ross—that resulted in approximately $11 million in over-charges of management and performance fees to fund investors, and the inflation of DLI's private funds' returns.

115. On April 1, 2019, the Court entered the Receivership Order.

116. The Receivership Order authorized the Permanent Receiver to "institute, pursue, and defend all claims and causes of action of whatever kind and nature which may now or hereafter exist as a result of the present or past employee or agents of the Receivership Entities."

117. On May 13, 2019, the Permanent Receiver filed an *ex parte* emergency application in the Enforcement Action for authority from the Court to commence a voluntary liquidation proceeding for DLIFF in the Cayman Island and to request that the Permanent Receiver be authorized to be one of the co-liquidators of DLIFF in the Cayman Islands.

118. On May 14, 2019, this Court granted the *ex parte* application by its Order, Docket Number 43.

119. On June 14, 2019, Bradley D. Sharp and Christopher D. Johnson, as JOLs, filed a petition to place DLIFF's liquidation under the supervision of the Cayman Court.

COMPLAINT

120.   On July 25, 2019, the Cayman Court ordered that DLIFF's liquidation continue under the supervision of the Cayman Court and appointed the Permanent Receiver and Christopher D. Johnson as the JOLs.

121.   Wherefore, the Plaintiffs now plead and assert the following claims on behalf of DLI, DLIF, DLIFF, the Master Fund, and DLI Assets Bravo, LLC:

## FIRST CAUSE OF ACTION

### Professional Negligence

122.   Plaintiffs repeat and incorporate by reference each of the prior allegations in this Complaint, as set forth above.

123.   Duff & Phelps formed a professional relationship with DLI in 2016, under which Duff & Phelps agreed to provide valuation services.

124.   Duff & Phelps's services continued at least through January 28, 2019.

125.   As a result of that professional relationship, Duff & Phelps owed DLI a duty to act in accordance with standards of care ordinarily provided by valuation firms providing valuation services.

126.   Duff & Phelps's conduct fell below the applicable standard of care because it failed to use the skill and care that a reasonable valuation firm would have used under similar circumstances.

127.   Duff & Phelps failed to exercise the ordinary care, skill, and diligence by, among other things, making material mistakes and incorrect statements in the valuations; making gross errors in methodology and conclusion of value as to numerous DLI investments that resulted in massive overstatement of the value of DLI's investments; and failing to identify, discuss, disclose, analyze, or account for material risks to DLI's investments, even when Duff & Phelps was aware of those risks or was asked to opine on them.

128.   Duff & Phelps knew that its valuations would be relied upon by DLI and the Receivership Entities in conducting their business and that it owed a duty of care to DLI to exercise the ordinary care, skill, and diligence that a reasonably

COMPLAINT

careful valuation firm would have used under similar circumstances.

129.   Duff & Phelps's valuations and related representations and work were relied upon by DLI, DLIFF, and the Receivership Entities.

130.   Duff & Phelps's negligent conduct was a substantial factor in causing harm to the Receivership Entities and DLIFF.

131.   As a direct and proximate result of Duff & Phelps's negligent conduct described above, the Receivership Entities and DLIFF have been harmed in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Gross Negligence

132.   Plaintiffs repeat and incorporate by reference each of the prior allegations in this Complaint, as set forth above.

133.   Duff & Phelps's conduct described above evinces a reckless disregard for the rights of DLI, DLIFF, and the Receivership Entities, and such conduct directly and proximately caused harm to the Receivership Entities and DLIFF in an amount to be determined at trial.

134.   Duff & Phelps's actions were undertaken with the awareness of the probable dangerous consequences of its conduct, and Duff & Phelps willfully and deliberately failed to avoid those consequences. Plaintiffs should be awarded punitive damages sufficient to punish Duff & Phelps and to deter similar conduct in the future.

## THIRD CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duty

135.   Plaintiffs repeat and incorporate by reference each of the prior allegations in this Complaint, as set forth above.

136.   Defendant aided and abetted Ross's breaches of his fiduciary duties to DLI, DLIFF, and the Receivership Entities. Additionally, Defendant knew of the relationship among the Receivership Entities and that DLI owed a fiduciary duty to

the Master Fund, DLIF, and DLIFF. Defendant knew that Ross and DLI breached their fiduciary duties and provided substantial assistance in committing the primary breaches of fiduciary duty. Defendant knew Ross and DLI earned fees from high valuations. Defendant knew that DLI's investments were overvalued, elected to ignore warning signs that indicated overvaluation, and even assisted in supporting the overvaluations to enable Ross, his personal entities, and DLI to continue to collect high fees in violation of duties owed to the Master Fund, DLIF, and DLIFF.

137. Accordingly, Defendant knowingly participated in the fiduciary breaches by Ross and DLI and is liable to Plaintiffs for damages caused to the Receivership Entities and DLIFF in an amount to be determined according to proof at trial.

## FOURTH CAUSE OF ACTION

### Negligent Misrepresentation

138. Plaintiffs repeat and incorporate by reference each of the prior allegations in this Complaint, as set forth above.

139. Defendant made numerous false and misleading representations about the value of various investments. DLI, DLIF, DLIFF, the Master Fund, and the other Receivership Entities reasonably relied on these representations regarding value. They also reasonably relied on the ongoing statements of Defendants. The Receivership Entities and DLIFF's reliance on Defendant's false and misleading representations was a substantial factor in causing their harm.

140. Further, Defendant made false statements of value knowing that the valuations were required for a particular purpose, that others outside of the Engagement Letter were relying to their detriment on the accuracy of Defendant's valuations, and Defendant failed to take reasonable care to make sure that its statements were accurate.

141. As a result of the Defendant's conduct, the Receivership Entities and DLIFF have suffered and continue to suffer economic losses, in an amount to be

COMPLAINT

determined according to proof at trial.

## FIFTH CAUSE OF ACTION

### Breach of Contract

142.   Plaintiffs reallege and incorporate herein by reference each and every allegation in all the preceding paragraphs as if fully set forth herein.

143.   The Engagement Letter contains binding agreements by Defendant.

144.   DLI did all of the significant things the Engagement Letter required it to do and duly performed all covenants, obligations, and conditions required to be performed by and under the Engagement Letter.

145.   Defendant has failed to perform its part of the Engagement Letter agreement. Specifically, among other things, Defendant failed to do the following:

a. Defendant failed to apply its judgment, in consultation with DLI's management, in generating a range of fair value estimates for DLI's investments.

b. Defendant failed to assess the reasonableness of DLI's internal cash flow estimates for the investments.

c. Defendant failed to ask for facts and circumstances necessary for its analysis.

d. Defendant failed to use and rely upon not just information provided by DLI, but also information obtained from various public, financial, and industry sources.

e. Defendant failed to use the definition of "fair value" provided by ASC §820 in rendering its services.

146.   As a direct result of Defendant's breach, the Receivership Entities and DLIFF have sustained damages, in an amount to be determined according to proof at trial.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court enter judgment:

29

COMPLAINT

1. Directing Duff & Phelps to pay damages to the Receivership Entities, DLI, DLI Capital, Inc., DLIF, DLIFF, and DLI Assets Bravo LLC, plus interest, in an amount to be determined at time of trial;

2. Awarding punitive damages, in an amount to be determined at trial;

3. Ordering Duff & Phelps to disgorge all fees paid to Duff & Phelps by DLI; and

4. Such other and further relief as the Court may deem just and proper.

DIAMOND MCCARTHY LLP

DATED: September 3, 2020          By: _____

Christopher D. Sullivan
Counsel for Bradley D. Sharp,
Permanent Receiver, and Bradley D. Sharp
and Christopher D. Johnson as Joint
Official Liquidators of DLIFF (in Official
Liquidation)

COMPLAINT

## JURY TRIAL DEMAND

Plaintiffs respectfully demands a trial by jury of all issues triable to a jury.

DATED: September 3, 2020

DIAMOND MCCARTHY LLP

By: _____

Christopher D. Sullivan
Counsel for Bradley D. Sharp,
Permanent Receiver, and Bradley D. Sharp
and Christopher D. Johnson as Joint
Official Liquidators of DLIFF (in Official
Liquidation)

31

COMPLAINT